UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| SHIRLEY HINTON-TRIGG on behalf of D.H., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO. 1:12-CV-00010 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Shirley Hinton-Trigg, on behalf of her minor granddaughter D.H., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Hinton-Trigg applied on D.H.'s behalf for SSI in November 2008, alleging disability as of June 1, 2007. (Tr. 131-37.) The Commissioner denied the application initially and upon reconsideration. (Tr. 74-86.) A hearing was held on July 15, 2010, before Administrative Law Judge ("ALJ") John Pope, at which D.H. and Hinton-Trigg, who were represented by counsel, testified. (Tr. 11-39.) On August 23, 2010, the ALJ rendered an unfavorable decision, concluding that D.H. was not disabled. (Tr. 45-58.) The Appeals Council denied her request for

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-10, 411-15.)

Russell filed a complaint with this Court on January 12, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) She advances just one argument in this appeal—that the ALJ improperly evaluated whether she met Listing 111.07B4, the listing for cerebral palsy. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 12-15.)

## II. FACTUAL BACKGROUND[2]

### A. *D.H.'s Testimony at the Hearing*

D.H. alleges disability due to cerebral palsy, asthma, a learning disorder, and a history of disruptive behavior disorder. (Opening Br. 2.) At the hearing, D.H., who was fourteen years old at the time, testified that she had just completed eighth grade, which included special education classes, and planned to attend high school in the fall; she lived with her grandmother, step-grandfather, and uncle in a one-story home. (Tr. 17-19.) She said that she does not have any physical problems. (Tr. 20.)

On a typical school day, D.H. gets up at 6:00 a.m., independently performs her self care, and walks to the bus with friends. (Tr. 21-23.) She takes the bus back home after school and then does homework in her room for an hour; afterwards, she plays outside for several hours. (Tr. 22-23.) She eats dinner around 8:00 p.m., watches television in her room, and then goes to bed. (Tr. 23.) She can prepare her own meals and grocery shop, but does not do any other chores around the house. (Tr. 23-24.) She participated in cheerleading in sixth and seventh grades, but

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 747-page administrative record necessary to the decision.

2

was not currently involved in a sport, explaining that she needed to focus on her homework. (Tr. 24.) She has numerous neighborhood friends that she spends time with every day, and they go shopping, to the movies, and to restaurants. (Tr. 25-26.) D.H. said that she has no problems concentrating when in school or in getting along with her friends. (Tr. 26.)

*B. Hinton-Trigg's Testimony at the Hearing*

Hinton-Trigg testified that it takes forty-five minutes in the morning for D.H. "to get her balance together" due to her cerebral palsy. (Tr. 28.) She elaborated that she has to help D.H. get up and put her shoes on "to keep her from falling." (Tr. 29.) D.H. is supposed to do some chores around the house, but Hinton-Trigg often has to remind her to do so (Tr. 35-36); D.H. can, however, prepare simple meals (Tr. 36).

Hinton-Trigg stated that D.H. is not coordinated and that other kids laugh at her when she tries to participate in sports (Tr. 29); she also has "a little trouble" riding a bike (Tr. 35). Hinton-Trigg said that D.H. does not receive any treatment for her cerebral palsy and that her doctor had dismissed her. (Tr. 30.) Hinton-Trigg thought that D.H. had poor handwriting, but that her coloring of pictures was much better than when she was a young child. (Tr. 33-34.)

In addition, Hinton-Trigg reported that D.H. has a learning disability and attention deficit disorder ("ADHD"); she receives tutoring at least twice a week because she was failing about every class. (Tr. 29-30.) D.H. also takes medication for asthma, which does not cause her side effects. (Tr. 30-33.) Hinton-Trigg testified that D.H. gets along well with younger children, but gets upset with children her own age when she cannot do what they do and they call her names. (Tr. 36.) She at times wants to get into physical fights. (Tr. 37.)

*C. Medical Evidence Prior to D.H.'s Alleged Onset Date of June 1, 2007*

In April 1999, a school psychologist evaluated D.H. as a preschooler and diagnosed her with a mild mental handicap. (Tr. 402-05.) She was also seen by a physician for a history of possible seizures. (Tr. 648-49.) A 24-hour video electroencephalogram, however, was entirely within normal limits. (Tr. 646.) Similarly, in April 2001, an overnight sleep study was normal. (Tr. 643.)

In June 2001, D.H. saw Dr. Daniel Cummiskey at Fort Wayne Orthopaedics for her cerebral palsy. (Tr. 613-14.) She had been diagnosed with right-sided hemiplegia and reportedly tripped at times. (Tr. 613.) On exam, she had some difficulty hopping on her left foot and when she ran she pronated her left arm more than her right. (Tr. 613.) He concluded that she had a "[v]ery mild case of cerebral palsy" and thought that she was going to do "really quite well." (Tr. 613.) He recommended "absolutely no intervention" and that she be treated "totally as a normal child without any restrictions." (Tr. 614.)

In February 2002, D.H. saw Dr. Joe Ottinger, a pediatric neurologist, for her cerebral palsy; he thought that she was "quite stable" and progressing fairly well. (Tr. 637.) She displayed mild left upper extremity weakness and somewhat hyperactive reflexes in the lower extremities. (Tr. 637.) She walked "fairly well," but had a slight spastic quality to her gait when she ran, more so on the left than the right. (Tr. 637.)

In March 2002, D.H. underwent testing by another school psychologist. (Tr. 396-99.) Her IQ scores were average, and her basic reading and math reasoning were within the range expected for her age. (Tr. 396-99.)

In March 2003, D.H. saw Dr. Ottinger for her seizures. (Tr. 626.) He thought she was

4

doing quite well on the Trileptal in that it had controlled her seizures, even though it made her sleepy. (Tr. 626.) He cut back slightly on her dosage to decrease her fatigue. (Tr. 626.)

In December 2003, Dr. Houda Taki noted that D.H. had full range of motion of her lower extremities and opined that she was doing "reasonably well" except for fine motor control. (Tr. 610.) She complained of some anterior knee pain. (Tr. 610.) That same month, Dr. Cummiskey wrote "[t]o whom it may concern" that D.H., who was seven years old at the time, had a mild case of cerebral palsy and needed an individualized education program, at least with respect to her gym class. (Tr. 576.) He penned that her cerebral palsy "affects significant fine motor control in the upper extremities, and certainly makes her a bit less coordinated involving activities with her lower extremities." (Tr. 576.)

In March 2004, Dr. Ottinger noted that D.H. was "pretty stiff" when she first gets up in the morning, but otherwise does well. (Tr. 621.) He found her strength and reflexes satisfactory. (Tr. 621.) He continued the Trileptal for her seizures. (Tr. 621.)

In January 2005, Dr. Ottinger documented that D.H. had been seizure-free for two years. (Tr. 619.) He thought that her biggest problem was that she was having trouble in school, particularly with comprehension. (Tr. 619.) He decided to wean her off of the Trileptal. (Tr. 619.)

In March 2005, D.H. scored in the lower limits of the low average range on the ABES-R, which measured her adaptive behavior and adjustment in the academic setting. (Tr. 278-91.) Her general cognitive ability, as estimated by the WISC-IV, was in the borderline range, and her fine motor/perceptual development appeared to be within the low average range. (Tr. 278-91.)

*D. Medical Evidence After D.H.'s Alleged Onset Date of June 1, 2007*

From February 2008 to April 2009, D.H. received psychotherapy from therapist Teddy Ramsey on a monthly basis. (Tr. 446-59, 501-20.)

On January 10, 2009, Dr. Michael Holton examined D.H. at the request of the Social Security Administration. (Tr. 523-25.) On physical exam, she had no difficulty with tandem walking, hopping, or squatting, but at times slightly favored her right lower extremity when heel and toe walking. (Tr. 524-25.) Her muscle tone and strength were normal in all four extremities, and no asymmetry was noted in active range of motion. (Tr. 525.) Dr. Holton's impression was a history of asthma, a history of cerebral palsy with minimal right-side motor weakness, and psychological concerns and learning disability. (Tr. 525.)

That same month, Wayne Von Bargen, Ph.D., performed a psychological evaluation at the Social Security Administration's request. (Tr. 527-33.) On intelligence testing, D.H. obtained a full scale IQ of 79, which falls at the upper end of the borderline range. (Tr. 528.) On the general ability index, she scored an 81, which falls in the low average range; Dr. Von Bargen found that this index was likely a better measure of overall learning ability than her full scale IQ score. (Tr. 529.) He thought that a classification of "learning disorder" was a better description of D.H.'s level of functioning than borderline intellectual functioning. (Tr. 529.) He diagnosed D.H. with a disruptive behavior disorder and a learning disorder. (Tr. 529.)

In February 2009, J. Gange, Ph.D., and Steven Roush, M.D., state agency doctors, reviewed D.H.'s record and concluded that her impairment or combination of impairments were severe, but did not meet or equal a listing. (Tr. 561-66.) They found that she had a less than a marked limitation in acquiring and using information, no limitation in attending and completing

6

tasks, no limitation in interacting or relating with others, no limitation in moving about and manipulating objects, no limitation in caring for herself, and no limitation in health and physical well-being. (Tr. 563-64.) Four months later, F. Kladder, Ph.D., and Joseph Gaddy, M.D., also state agency doctors, reviewed D.H.'s record and reached the same conclusions. (Tr. 567-72.)

In June 2009, D.H. was evaluated by Dr. Patricia Bader of the Northeast Indiana Genetic Counseling Center. (Tr. 585-86.) She noted that D.H. had fetal alcohol syndrome features and, after testing, diagnosed her with fetal alcohol syndrome and cerebral palsy. (Tr. 583-84.) Hinton-Trigg reported on a return visit to Dr. Bader that D.H. was refusing to take her medications, was having mood swings, and was getting low grades in school. (Tr. 583.)

In August 2009, Dr. Barbara Gelder evaluated D.H. and diagnosed her with an anxiety disorder, ADHD by history, rule out organic encephalopathy, prenatal exposure to teratogens, fetal alcohol syndrome, ataxia, cerebral palsy on the right side, and biological parent-child problem. (Tr. 599-601.) Several months later, Dr. Gelder performed a neuropsychological examination. (Tr. 587-98.) D.H. rated her current level of depression as a "five" on a ten-point scale, but denied any thoughts of hurting herself; she reported significant problems with racing thoughts, obsessive thinking, worries, inattention, and in understanding oral instructions. (Tr. 589.) Dr. Gelder noted that D.H.'s attention span and concentration were adequate with occasional encouragement. (Tr. 589.)

Hinton-Trigg responded to the Personality Inventory for Children that Dr. Gelder administered, and the results suggested that D.H. was experiencing significant emotional and behavioral maladjustment in comparison to children of her chronological age. (Tr. 589.) The results indicated, however, that the profile should be interpreted with caution in that the

7

responses were likely to have been made without adequate attention to, or comprehension of, the inventory items. (Tr. 589.) Dr. Gelder also administered the Rorschach to D.H., which suggested that she frequently overlooks the subtle nuances of social interpersonal situations, arrives at decisions without having given them much thought, and selects a course of action in which she has little emotional investment. (Tr. 589.) She feels most comfortable in clearly-defined and well-structured situations. (Tr. 589.) She is not likely to recognize the kinds of behaviors that are expected in various situations, placing her at risk for behaving in ways that offend others and for being socially and emotionally withdrawn. (Tr. 589.) D.H.'s visual information processing and abstract reasoning skills were borderline. (Tr. 592.) Results of the NEPSY-II indicated that she did not appear to have difficulty reading the emotional responses of others. (Tr. 593.) She did, however, have difficulty understanding mental functions such as belief, intention, deception, emotion, imagination, and pretending. (Tr. 593.) On the Vineland on Adaptive Behavioral Scales, D.H. scored in the mildly impaired range of functioning in communication, daily living skills, and socialization. (Tr. 594.)

Dr. Gelder concluded that D.H.'s emotional profile was significant for clinical levels of inattention, distractibility, anxiety, depression, and problematic adaptive functioning; her overall adaptive behavior composite was mildly impaired. (Tr. 594.) Dr. Gelder's impression was that D.H.'s profile was consistent with an individual who has congenital factors contributing to her difficulties with resulting long-term consequences. (Tr. 594.) These consequences include: inattention, distractibilitiy, impulsivity, problems with planning and organizing, social skills deficits, lowered frustration tolerance, and a tendency to become overwhelmed with less stimulation than most individuals. (Tr. 594.) She is often inappropriate in her response,

inefficient when determining which elements of a situation need attention, "forgets" important and necessary aspects of the total situation, reaches incorrect conclusions, and engages in inappropriate behavior. (Tr. 595.) From August to November 2009, D.H. participated in counseling sessions with a therapist in Dr. Gelder's office. (Tr. 658-704.)

In March 2010, D.H.'s school plan summary indicated that she communicates her wants and needs effectively, gets along well with peers and adults, is very kind, and easily makes and maintains friendships. (Tr. 740-42.) She does, however, have a temper when teased to the extreme. (Tr. 740.) She was working below expectation levels and did not like to get extra help. (Tr. 740.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

9

are supported by substantial evidence, they are conclusive. *Id*. Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id*.

## IV. ANALYSIS

### A. *The Law*

To be disabled for purposes of SSI benefits, a child "must have a 'physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Brindisi ex rel Brindisi*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)). The Social Security Administration has adopted a three-step process for determining whether a child is disabled. *Id.*; 20 C.F.R. § 416.924.

"First, if the child is engaged in substantial gainful activity, his or her claim is denied." *Brindisi*, 315 F.3d at 785 (citing 20 C.F.R. § 416.924(a)). "Second, if the child does not have a medically determinable 'severe' impairment or combination of impairments, then his or her claim is denied." *Id*. (citing 20 C.F.R. § 416.924(a)). "Finally, for a child to be considered disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment . . . ." *Id*. (citing 20 C.F.R. § 416.924(a)). "To find an impairment functionally equivalent to a listing, an ALJ must analyze its severity in [six] age-appropriate categories and find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Id*. (citing 20 C.F.R. § 416.926a(a)).

### B. *The ALJ's Decision*

On August 23, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 45-58.) He found at step one of the three-step analysis that

10

D.H. was an "adolescent" under 20 C.F.R. § 416.926a(g)(2) and had not engaged in substantial gainful activity after the SSI application date. (Tr. 48.) At step two, the ALJ concluded that D.H.'s history of cerebral palsy, asthma, a learning disorder, and history of disruptive behavior disorder were severe impairments. (Tr. 48.) The ALJ determined at step three, however, that D.H.'s impairment or combination of impairments were not severe enough to meet or equal a listing. (Tr. 48-49.) Accordingly, her claim for SSI was denied. (Tr. 57.)

### C. *Substantial Evidence Supports the ALJ's Finding That D.H. Did Not Meet or Equal Listing 111.07B4*

In her sole argument in this appeal, Hinton-Trigg contends that the ALJ improperly evaluated whether D.H. met or medically equaled Listing 111.07B4, the listing for cerebral palsy. Ultimately, Hinton-Trigg's argument is unavailing, as the ALJ's step-three finding is supported by substantial evidence.

The listings describe impairments that are considered presumptively disabling when specific criteria are met. 20 C.F.R. § 416.925(a); 20 C.F.R. § 404, Subpt. P, App. 1; *see Kastner v. Astrue*, 697 F.3d 642, 646-67 (7th Cir. 2012). To meet or medically equal a listed impairment, a claimant must satisfy *all* of the criteria of the listed impairment. *Kastner*, 697 F.3d at 647; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999). The claimant bears the burden of proving that her condition meets or medically equals a listed impairment. *Ribaudo*, 458 F.3d at 483; *Maggard*, 167 F.3d at 379-80.

To satisfy Listing 111.07, a claimant must have a diagnosis of cerebral palsy, with:

A. Motor dysfunction meeting the requirements of Listing 111.06 or 101.03; or

B. Less severe motor dysfunction (but more than slight) and one of the following:

    1. IQ of 70 or less;

11

2. A seizure disorder, with at least one major seizure in the year prior to the application for disability;

3. Significant interference with communication due to speech, hearing, or visual defects; or

4. A significant emotional disorder.

20 C.F.R. Part 404, Subpart P, App. 1.

Here, at step three, after considering Listings 112.05 (mental retardation), 112.11 (ADHD), and 103.03 (asthma), the ALJ specifically considered Listing 111.07:

> Finally, for claimant's history of cerebral palsy, the undersigned considered listing 111.07. However, the medical record indicates that claimant has a very mild case of cerebral palsy and according to her treating physician, she has no physical restrictions. Therefore, there is no severe motor dysfunction or less severe motor dysfunction with an IQ less than 70; a seizure disorder; significant interference with communication due to speech, hearing, or visual defect; or a significant emotional disorder.

(Tr. 49 (internal citations omitted).) D.H. argues that the ALJ's step-three finding is not supported by substantial evidence. More specifically, she contends that the record, when reviewed fairly, shows that she meets Listing 111.07B4 in that her motor dysfunction is "more than slight" and she has a "significant emotional disorder."[3]

With respect to the first prong, D.H. cites seven pieces of medical evidence that the ALJ purportedly ignored that she contends demonstrates her motor dysfunction is "more than slight":

1. A May 2001 sleep study noting abnormal twitching and jerking in her sleep;

2. Several of Dr. Cummiskey's notes from 2001 to 2004 reflecting that D.H. "trips at times" (Tr. 613), had bilateral knee pain (Tr. 610), and reported "significant morning stiffness and pain" (Tr. 607);

3. Dr. Cummiskey's December 2003 letter addressed "To whom it may concern"

---

[3] There is no dispute that D.H. has a diagnosis of cerebral palsy.

recommending that D.H. be given an individualized education program, at least for gym class, and representing that her "mild case of cerebral palsy . . . affects significant fine motor control in the upper extremities, and certainly makes her a bit less coordinated involving activities with her lower extremities" (Tr. 576);

4. An "observation request" from her 2001 school records, with boxes checked for poor handwriting skills, lack of gross motor coordination, difficulty with tasks requiring eye-hand coordination, and "works exceptionally slowly" (Tr. 324);

5. Dr. Ottinger's March 8, 2005, note on a prescription pad representing that D.H.'s mild cerebral palsy and history of a seizure disorder "may certainly affect learning and/or school performance, though [he] cannot predict exactly how her learning may be affected" (Tr. 577);

6. Dr. Holton's January 10, 2009, examination documenting D.H.'s reported history of cerebral palsy with some right-sided weakness upon prolonged or repetitive activity (Tr. 523-25); and

7. The results of a June 2009 MRI consistent with a history of cerebral palsy (Tr. 578).

(Opening Br. 13.)

D.H.'s argument that the ALJ "cherry-picked" the record and ignored this evidence purportedly unfavorable to his conclusion, however, is unpersuasive. "[A]n ALJ need not mention every snippet of evidence in the record . . . ." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2002). Rather, an ALJ "must connect the evidence to the conclusion, [and] in so doing, he may not ignore entire lines of contrary evidence." *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.").

Here, the ALJ adequately connected the evidence of record to his conclusion that D.H.'s motor dysfunction was no more than slight and, in so doing, did not ignore an entire line of evidence unfavorable to his conclusion. In fact, the ALJ *did* explicitly mention several of the pieces of evidence that D.H. cites. For example, he considered the claimant's subjective report

13

of minimal unilateral weakness, but concluded that it did not interfere with normal functioning, such as her ability to participate in cheerleading. (Tr. 55.) In that regard, he considered that despite Hinton-Trigg's claim that D.H. does not participate in sports because of purported balance and coordination difficulties, D.H. testified that she quit cheerleading after two years in the sport in order to improve her grades, *not* because of coordination or motor challenges. (Tr. 55.) The ALJ also explicitly mentioned Dr. Cummiskey's December 2003 letter representing that D.H.'s mild case of cerebral palsy affected her fine motor control and made her a bit less coordinated in activities with her lower extremities. (Tr. 57.) The ALJ at the same time, however, considered Dr. Cummiskey's documentation in his own file that D.H. had a very mild case of cerebral palsy and should be treated as a normal child without any restrictions or physical therapy intervention. (Tr. 57 (citing Tr. 614).)

Furthermore, the only evidence that Hinton-Trigg points to dated after D.H.'s alleged onset date of June 1, 2007—Dr. Holton's January 2009 evaluation and the June 2009 MRI—merely reflect her subjective report of D.H.'s symptoms or confirm D.H.'s diagnosis of cerebral palsy. (*See* Tr. 523-25, 578.) But "medical opinions upon which an ALJ should rely need to be based upon objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004). Furthermore, the relevant inquiry is the degree of claimant's limitations during the relevant period, not the diagnosis that she was assigned. *See Hodges v. Astrue*, No. 1:09-cv-216, 2010 WL 3717256, at *9 (N.D. Ind. Sept. 14, 2010); *see also Brown v. Astrue*, No. H-08-2299, 2010 WL 1257804, at *8 (S.D. Tex. Mar. 25, 2010) (emphasizing that the listings criteria are "demanding and stringent, and the mere diagnosis of a condition will not suffice" (internal quotation marks and

citation omitted)). Therefore, these snippets fall short of constituting an "entire line of evidence" that the ALJ inappropriately ignored. *See, e.g.*, *Waldron v. Astrue*, No. 1:11-cv-340, 2012 WL 4866353, at *12 (N.D. Ind. Oct. 12, 2012) (rejecting claimant's argument that the ALJ "cherry-picked" the record where the evidence at issue fell short of an "entire line of evidence").

Moreover, in reaching his step-three finding, the ALJ relied upon the assessments of Drs. Gange, Roush, Kladder, and Gaddy, the state agency physicians and psychologists who concluded that D.H.'s impairments did not meet or equal a listing. They completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that D.H. was not disabled. (Tr. 40-41, 60-63.) The Seventh Circuit Court of Appeals has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citations and internal quotation marks omitted). Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id.* (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL 374180, at *2.

Not to be deterred, Hinton-Trigg, citing *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), argues that the state agency doctors reviewed the record and rendered their opinions *before* her attorney submitted Dr. Cummiskey's documentation and certain school records, and thus that the ALJ erred by relying on the state agency doctors' opinions. But *Ribaudo* is distinguishable, as there the Commissioner argued that the Disability Determination and Transmittal forms completed by the state agency doctors, standing alone, cured the ALJ's failure to even mention the applicable listing or contradictory evidence in the record.

15

But here, as explained above, the ALJ specifically analyzed Listing 111.07B4, discussed Dr. Cummiskey's records, and provided more than a "perfunctory analysis" of the Listing. (Tr. 49, 55, 57); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."); *see generally Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) (collecting cases and stating that "tidy packaging" is not required for an ALJ's decision because courts read them "as a whole and with common sense"). That is, this is *not* a case where the ALJ failed to discuss significant contrary medical evidence added to the record after the state agency doctors issued their report. *See, e.g.*, *Leonard ex rel. Bernard v. Astrue*, No. 08 C 6464, 2010 WL 4705152, at *10 (N.D. Ill. Nov. 10, 2010) (explaining that obtaining an updated opinion from the state agency doctors on medical equivalence may be indicated where the ALJ fails to discuss additional medical evidence that could change the state agency doctors' earlier decision).

Once boiled down, Hinton-Trigg's argument amounts to merely a plea to this Court to reweigh the evidence with the hope that it will come out in her favor this time. But of course, the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence," and thus her plea is unavailing. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *see Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or substitute our own judgment for that of the ALJ.").

In sum, the ALJ's conclusion that D.H. had "no more than slight" motor dysfunction and thus did not satisfy Listing 111.07B4 is supported by substantial evidence. The ALJ minimally articulated his reasoning with respect to D.H.'s medical and school records, and the snippets of

16

evidence that Hinton-Trigg cites to do not rise to "an entire line of evidence" that would constitute a failure-to-articulate error by the ALJ. *Carlson*, 999 F.2d at 181. Therefore, Hinton-Trigg fails to carry her burden of establishing that D.H. meets or equals all of the criteria of Listing 111.07B4. *See Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at *14 (N.D. Ind. Mar. 25, 2010); *see generally Scheck*, 357 F.3d at 702 ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."). Accordingly, the ALJ's step-three finding will be AFFIRMED.[4]

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Hinton-Trigg.

SO ORDERED.

Enter for this 22nd day of January, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[4] Hinton-Trigg does not argue that D.H. functionally equals the listings, and thus has forfeited any challenge in that regard. *See Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006) (citing *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004)). To determine whether a child functionally equals the listings, the ALJ assesses how a child functions in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If the child's impairments cause "marked" limitations in two domains or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). Here, the ALJ concluded that D.H. had a "less than marked" limitation in acquiring and using information and no limitation in any of the other five domains, which is consistent with the findings of the state agency doctors. (Tr. 49-57, 561-72.)